SKC

WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Michael Dewayne Outley, Jr.,

Plaintiff,

v.

Sylvia Moir, et al.,

Defendants.

No.  CV 19-00019-PHX-JAT (JFM)

**ORDER**

Plaintiff Michael Dewayne Outley, Jr., brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Defendants Tempe Police Department (TPD) Officers Daniel Gaughan, Joseph Krajcer, Joseph Rowan, Tyler Robinson, and Anthony Trow and former TPD Police Chief Sylvia Moir move for summary judgment.  (Doc. 143.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 147), and he opposes the Motion.  (Doc. 152.)  Defendants filed a Reply.  (Doc. 160.)

The Court will grant the Motion for Summary Judgment.

## I.    Background

On screening Plaintiff's First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined Plaintiff stated constitutional claims against Defendant TPD Officers Krajcer, Robinson, Rowan, and Gaughan, TPD Public Liaison Jane/John Doe, and Police Chief Moir in connection with Plaintiff's January 25, 2018 arrest in Tempe, Arizona and ordered service on all but the Doe Defendant, pending specific identification.  (Doc. 13.)

The Court stayed the action at that time because the criminal case against Plaintiff arising from his arrest was still pending.  (*Id.*)

Approximately one year later, the Court lifted the stay, and Plaintiff filed a Motion to Amend and a proposed Second Amended Complaint.  (Docs. 50, 51.)  On screening the Second Amended Complaint, the Court found Plaintiff stated constitutional claims in Count One against Defendant Officers Krajcer, Gaughan, Robinson, Rowan, and Blair, stemming from his arrest, and constitutional privacy claims in Count Two against Defendants TPD Public Liaison John/Jane Doe and Police Chief Moir, stemming from their alleged disclosure and release of Plaintiff's juvenile crime records; the Court dismissed the remaining claims and Defendants.  (Doc. 110 (granting and amending in part Magistrate Judge Metcalf's Report and Recommendation at Doc. 79).)  Plaintiff later substituted Defendant Officer Trow for Defendant John/Jane Doe in Count Two (Doc. 114), and the Court subsequently dismissed Defendant Officer Blair from Count One without prejudice for failure to serve.  (Doc. 140.)

## II.   Legal Standards

### A.   Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## B.    Video Evidence

Where video evidence is available in an excessive use-of-force case, the Supreme Court has directed that courts "should [] view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380−81 (2007).  This does not mean that courts no longer take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute.  Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

. . . .

. . . .

. . . .

. . . .

### III.     Count One: Fourth Amendment Claims

#### A.     Facts

##### 1.     High-Speed Pursuit

On January 25, 2018, at 4:09 a.m., TPD Officers Gaughan, Krajcer, Rowan, and Robinson heard radio traffic that a caller had reported that a grey Chevy Trailblazer with license plate AEZ5939, going eastbound on Baseline Road, had run a red light and stop sign and almost hit her vehicle.  (Doc. 144 (Defs.' Statement of Facts) ¶ 2.)  Plaintiff disputes that the caller gave the license plate number, but audio of the call confirms that the caller complained about the Trailblazer's driving, speculating that the driver "must be drunk or something," and a male passenger called out the license plate number.  (Doc. 144, Ex. 1 (audio recording) at 00:20−00:42.)[1]

Radio traffic further conveyed that the Trailblazer had been stolen in a strong-armed robbery earlier that month when one of the suspects punched the victim in the back of the head.  (Doc. 144 ¶ 4.)  It was also reported that the current driver, later determined to be Plaintiff, had received directions from a clerk at the Chevron station on Baseline Road for the Red Roof Inn at 2135 W. 15th Street.  (*Id.* ¶ 5.)

At about 4:24 a.m., a non-Defendant TPD officer in a marked patrol car attempted to pull over the Trailblazer, using lights and sirens, but the driver did not pull over and instead sped away.  (*Id.* ¶¶ 7−8.)  Plaintiff admits to driving a grey Chevy Trailblazer, stopping at the Chevron station for directions to the Red Roof Inn, and that a TPD officer in a marked patrol car tried to pull him over, using lights and sirens.  (Doc. 153 ¶¶ 3, 5−7.)  He claims that he at first slowed down and contemplated stopping, but he does not dispute that he then sped off.  (*Id.*)

---

[1] Where either party's facts are flatly contradicted by real-time audio and video evidence, such that no reasonable jury could credit them, the Court has relied on the audio and video evidence to set forth the relevant facts.  *See Scott*, 550 U.S. at 380 (on summary judgment, the Court is not required to adopt a version of the facts that is "blatantly contradicted by the record, so that no reasonable jury could believe it").

Officer Gaughan, who was driving a marked Chevy Tahoe patrol car, saw the other TPD officer try to pull the Trailblazer over and the Trailblazer flee northbound on Priest Drive at a high rate of speed, and Officer Gaughan joined the pursuit with lights and sirens, but he lost sight of the Trailblazer as it was going 75−80 mph through the intersection of Priest Drive and Southern Avenue.  (Doc. 144 ¶ 9; Doc. 144-3 (Gaughan Decl.) ¶¶ 7−8.)  Officer Krajcer, who was driving an unmarked silver Chevy Silverado patrol vehicle with Officer Rowan as a passenger, activated his visor lights and joined the pursuit, but the pursuit was terminated.  (Doc. 144 ¶¶ 10, 12−13; Doc. 144-4 (Krajcer Decl.) ¶¶ 3−7.)  Based on radio traffic stating that the driver had asked for directions to the Red Roof Inn, Officer Krajcer drove to the Red Roof Inn to conduct surveillance.  (Doc. 144-4 (Krajcer Decl.) ¶¶ 8−9.)

### 2.    Vehicle Collisions at the Red Roof Inn

At about 5:10 a.m., Officer Krajcer saw the Trailblazer enter the Red Roof Inn parking lot.  (Doc. 144 ¶ 13.)  Officer Krajcer parked his unmarked Silverado at the south end of the parking lot and observed the Trailblazer moving slowly northbound on the east side of the Red Roof Inn.  (*Id.* ¶¶ 17−18.)[2]  Officer Krajcer can be heard on the radio, saying that the Trailblazer is on the east side, going north "towards the front of the business," then, "he's still creeping north; he hasn't parked yet; it looks like he's checking out the parking lot."  (*Id.* ¶ 22, Doc. 114, Ex. 1 (audio) at 16: 20−42; Doc. 144, Ex. 8 (Krajcer bodycam)

---

[2] It is not clear from the declaration evidence Defendants cite where Officer Krajcer's unmarked Silverado was in relation to the Red Roof Inn or the Trailblazer when Officer Krajcer initially saw the Trailblazer enter the Red Roof Inn parking lot or from which direction the Trailblazer entered.  It appears from the arial photograph Defendants provided of the Red Roof Inn that there is a single entrance on the north side of the property bordered by West 15th St., meaning the Trailblazer must have entered from the north side of the Red Roof Inn, driven south along the west side of the motel, looped around the back of the motel, and then began driving north on the east side of the motel, headed back in the direction of 15th Street, while Officer Krajcer watched its progress from his unmarked Silverado at the south (back) end of the parking lot.  (*See* Doc. 144-4 at 5 (arial photo).)

at 12:13:23).)[3]  During this exchange, the TPD dispatcher announced she was closing the channel for a possible "487 Victor," the police radio code for a vehicle theft.  (*Id.*)[4]

Officer Gaughan heard Officer Krajcer communicate the Trailblazer's location over the radio, and he drove his marked Tahoe toward the Red Roof Inn and asked Officer Krajcer over the radio, "do you want to block him in?" (Ex. 1 at 16:45; Gaughan Decl. ¶ 11.)  Officer Krajcer responded "he's up towards the front of the building now.  If you get there quickly, we can do that."  (Ex. 1 at 16:46−49; Gaughan Decl. ¶ 12.)  Video from Officer Krajcer's bodycam shows that, at this time, Officer Krajcer was parked facing into some foliage; then, after telling Officer Gaughan they could block the Trailblazer in, Officer Krajcer quickly turned the steering wheel to the left, squealing the tires, then

_____

[3] Defendants provided a DVD of non-electronic exhibits and an "Index of Non-Electronic Exhibits," listing the audio and video files on the DVD by exhibit numbers: 1, 8, 9, 10, 14, 15, 16, and 17.  (Doc. 148 at 2.)  There are, however, no corresponding exhibit numbers on the DVD, the files on the DVD are not in the same order listed in the Index, and five of the eight files have the same name: "AXON-Body-2-Video-2018-01-25," followed only by a unique start time.  Defendants' failure to identify and differentiate the video files on the DVD in way that corresponds to their Index or the exhibit numbers used throughout their Statement of Facts made it very difficult and time consuming for the Court to attempt to locate the correct video files cited in support of Defendants' Statement of Facts and to ascertain how each video file corresponds to the bodycam footage of each particular officer.  For ease of reference, the Court has determined that the files on the DVD correspond, in the order they appear, as follows: first is Ex. 1 (radio transmissions); second is Ex. 8 (Krajcer bodycam); third is Ex. 10 (Rowan bodycam); fourth is Ex. 15 (unidentified officer bodycam); fifth is Ex. 16 (unidentified officer bodycam); sixth is Ex. 17 (unidentified officer bodycam), seventh ("Pursuit") is Ex. 9 (Gaughan bodycam); and eighth ("Taser") is Ex. 14 (Robinson bodycam).  **In any future non-electronic filings, Defendants should consider naming and numbering DVD files in a way that clearly identifies and differentiates the content of each file and corresponds to the numerical ordering in their Index and exhibit numbers used in their Statement of Facts**.

[4] Defendants did not provide affidavit evidence or a key identifying the police radio codes used on the audio and video evidence in this action, and the Court was unable to locate a publicly available list of the codes commonly used by TPD dispatchers/officers.  However, the City of Mesa Police Department (MPD) makes police radio codes publicly available online, and the Court has relied on the MPD website to extrapolate this information.  *See* https://www.mesaazpolice.gov/about-mesa-pd/communications/radio-frequencies.  (last visited March 15, 2022).

straightened out the wheel and started driving forward (northbound) between the parking spaces bordering the east side of the motel and those bordering the bushes along the east site of the parking lot.  (Ex. 8 at 12:13:29−40; Doc. 144 ¶ 24; Doc. 144 at 4.)

At about the same time, Officer Gaughan entered the property from the northwest end of the parking lot and was driving eastbound along the front of the property with the parking lot exit behind him, when he spotted the Trailblazer coming slowly towards him from the northeast corner of the lot.  (Gaughan Decl. ¶ 13.)  Officer Gaughan activated his red and blue emergency lights and said to Officer Krajcer over the radio, "I got him.  Come around," then stopped his police vehicle with the lights still flashing and opened the car door to get out.  (Doc. 144 ¶ 26; Gaughan Decl. ¶¶ 15, 16.)

At this point, the Trailblazer started backing up, away from Officer Gaughan's vehicle, so Officer Gaughan did not get out but instead started driving forward while reporting over the radio, "He's backing up.  He's backing up towards your guys' side," meaning the east side of the motel.  (Doc. 144 ¶ 30; Ex. 1 at 16:54.)[5]  Officer Gaughan stopped his vehicle again for about 3 seconds, when the Trailblazer turned and started driving southbound toward Officer Krajcer's unmarked Silverado.  (Doc. 144 ¶¶ 31−35.)

A few seconds after Officer Gaughan stated over the radio, "He's backing up.  He's backing up," the audio and video from Officer Krajcer's bodycam shows sirens and red and blue police lights flashing up ahead while Officer Krajcer continues driving northbound; then, there is a loud crashing sound, and an airbag deploys from inside Officer Krajcer's vehicle.  (Krajcer bodycam at 12:13:46−52.)  Officer Krajcer can be heard over

---

[5] Plaintiff claims that these and various other statements based on the Officers' declarations and real-time audio and video recordings are contradicted by the TPD "transcript" of the radio traffic.  (*See*, *e.g.* Doc. 153 ¶ 30.)  Plaintiff mistakes a printed summary of the radio traffic as an exact transcript of the audio transmissions instead of as a dispatch summary of the incident.  (*See* Doc. 154-1, Ex. 1).  Where the officers' statements are properly supported by declaration and audio/video evidence, the dispatch report fails to create a genuine issue of fact regarding what the Officers said.

the police radio, saying "he just rammed us.  He just rammed us.  245 (radio code for aggravated assault) on officer." (Doc. 144, Ex. 1 at 17:00.)[6]

Video from Officer Gaughan's bodycam shows that, just after Officer Gaughan radioed to Officer Krajcer, "he's backing up, he's backing up towards your guys' side," Officer Gaughan restarted his vehicle and turned the wheel sharply to the right to point in a southeast direction.  (Doc. 144, Ex. 9, "Pursuit" (Gaughan bodycam) at 12:13:45−47.) Loud crashing sounds can then be heard on Officer Gaughan's bodycam video, along with Officer Krajcer saying, "He just rammed us! He just rammed us!"  (*Id.* at 12:13:47−52.) At about the same time, the side of the Trailblazer can briefly be seen through Officer Gaugan's windshield, at which point it is backing up, away from the site of the head-on collision with Officer Krajcer's vehicle, and the passenger side of the Trailblazer facing Officer Gaugan's vehicle is visibly dented.  (*Id.*)

According to Plaintiff, two collisions occurred at the same or nearly the same time: the head-on collision between the Trailblazer Plaintiff was driving and the truck (the unmarked Silverado) coming towards Plaintiff, and a collision between the Trailblazer and the marked Tahoe, which Plaintiff said "T-boned" the side of the Trailblazer between the front and back doors on the passenger side.  (Doc. 144-7 (Pl. Dep.) at 19:5−20:7.)[7]  When the crashing sounds are heard on Officer Gaughan's bodycam, the video is partially blocked from inside the car, and the evidence does not show any clear point of impact between Officer Gaughan's car and the Trailblazer.  (Gaughan bodycam at 12:13:47−52.) According to Officer Gaughan, "the front push bars on [the] Tahoe came into contact with the passenger side of the Trailblazer," but Officer Gaughan did not intentionally collide with the Trailblazer; the airbags of the Tahoe did not inflate, and the front push bar had

---

[6]   *See*   https://www.mesaazpolice.gov/about-mesa-pd/communications/radio-frequencies (last visited March 15, 2022).

[7]   The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system, not the internal page numbering of the deposition.

only minor scuffing from the impact.  (Gaughan Decl. ¶¶ 21−22.)  Officer Gaughan was not injured in the collision.  (*Id.* ¶ 23.)

After the crashes with the Trailblazer, Officer Gaughan immediately opened the driver's side door of his vehicle and yelled out, "Get out of the car! Get out of the Car!"; he then aimed a gun over the hinge area of the open door towards the Trailblazer and yelled, "You're gonna get shot, Dude!  Get out of the car!"  (*Id.* at 12:13: 52−56.)

At nearly the same time, video from Officer Krajcer's bodycam from outside the unmarked Silverado shows primarily the front driver's side portion of that vehicle, which now has a visibly crumpled hood, and both Officers Gaughan and Krajcer can be heard yelling, "Get out of the car!  Get out of the car!"  (Krajcer bodycam at 12:13:56.)  Based on its location shown on the bodycam video, the Trailblazer had, by then, backed up a couple of car lengths from the damaged front of the Silverado, and Officer Ghaughan's marked Tahoe can be seen to the left of it, angled slightly inward and ahead of the dented passenger side of the Trailblazer with its red and blue police lights still flashing.  (*Id.*)

According to Officers Krajcer and Rowan, Officer Krajcer flashed the emergency police lights on the visor of the unmarked Silverado at least once prior to the collision with the Trailblazer as he drove northbound toward the front of the property.  (Doc. 144 ¶ 37.) Plaintiff claims he did not see any police lights ahead of him as he was driving southbound, and he never saw Officer Krajcer's vehicle before the collision.  (Doc. 153 ¶ 36; Pl. Decl. ¶ 5.)  Plaintiff estimated that he was then driving forward at about 5 to 7 or 7 to 10 miles per hour, and he stated that, after the head-on collision, his neck was hurting.  (*Id.* at 20:8−18.)  Officer Krajcer suffered a headache, concussion, sore right knee, and stiff neck, for which he received medical attention later that day.  (Krajcer Decl. ¶ 23.)

While the officers were outside their cars, yelling for Plaintiff to get out of his vehicle, Plaintiff did not get out but suddenly sped forward and again began driving the Trailblazer southbound, this time around the damaged unmarked Silverado, towards the back of the parking lot.  (Gaughan bodycam at 12:13:55−58.)  Officer Gaughan again restarted his vehicle and radioed, "I am driving around to the South side right now," and

attempted to pursue the Trailblazer with his police lights and sirens activated.  (*Id.* at 12:13:56−12:14:35.)  At the same time, Officer Krajcer began running behind on foot, and he can be heard saying of his own car, "that vehicle's out of commission." (Krajcer bodycam at 12:13:56−12:14:49.)

Plaintiff drove the Trailblazer around the back of motel, towards the way he had come in, then exited left onto 15th Street and started driving towards the freeway. (Doc. 144-7 (Pl. Dep.) at 20:23−25.)  After he exited onto 15th Street, Plaintiff heard a noise and knew something was wrong with the Trailblazer; he then noticed it would not turn, and he realized the driver's side front tire was flat.  (*Id.* at 21:6−26.)  Plaintiff fled onto the highway frontage road, but he lost control of the vehicle and drove through a chain-link fence into a palm tree and then hit the front tire of a tractor.  (Doc. 144 ¶ 58.)

Officer Gaughan, who was following in his marked Tahoe with lights and sirens, saw Plaintiff collide with the tractor then get out of Trailblazer and start running in a business park, and he parked his vehicle and started running after Plaintiff but lost him. (Doc. 144 ¶¶ 59−60.)

### 3.    Plaintiff's Arrest

Officer Robinson, who had heard the earlier radio traffic and had searched unsuccessfully for the Trailblazer after the high-speed pursuit, learned from dispatch that the Trailblazer had rammed a squad car at the Red Roof Inn, and he added himself to the call.  (Doc. 144 ¶ 60; Doc. 144-6 (Robinson Decl.) ¶¶ 3−8.)  He heard Officer Gaughan describe the suspect as a black male in his early twenties with shoulder-length dread locks, wearing a grey shirt, and he heard that the suspect had just crashed the Trailblazer near 48th Street and University, got out, and was running north.  (Robinson Decl. ¶¶ 9−11.)

Officer Robinson drove to the area in his marked patrol car with the lights and siren activated and began searching a business park.  (*Id.* ¶ 12.)  When he spotted Plaintiff in the parking lot, he got out of his patrol car and began running after him, shouting, "Let me see your hands!  Stop, police!  You're going to get tased, Bro!  You're gonna' get tased!  Stop!" (Doc. 144 ¶¶ 64−65.)  Based on the video from Officer Robinson's bodycam, after about

20 seconds of Officer Robinson shouting and running after Plaintiff, Officer Robinson pulled out and pointed his yellow taser in front of him, and Plaintiff can be seen under some lights up ahead in the parking lot, standing sideways with his hands raised above his head, with two red dots from Officer Robinson's taser visible on his upper right side and thigh. (Doc. 144, Ex. 14, "Taser" (Robinson bodycam) at 12:18:52−12:19:13.)

At this point, Officer Robinson shouted three times, "Get on the ground!" while Plaintiff continued to stand with his hands up, repeating something like "I didn't; I didn't," and then turned toward Officer Robinson. (*Id.* at 12:19:13−18.) Officer Robinson yelled, "Turn away from me! You're gonna' get tased if you don't listen to me!" but Plaintiff did not get down and instead turned back to the side and took a couple steps while dropping his hands and moving them up and down close to his sides. (*Id.* at 12:19:18−26.)

Another officer then pulled up in a patrol car and emerged in front of Plaintiff, and, when Plaintiff did not comply with Officer Robinson's commands, said "you better get down," then began shouting, "Tase him! Tase him!" (*Id.*) The sound of a taser shot can then be heard, and a thin, grey zig-zag line from the taser appears in the air between Officer Robinson and Plaintiff; after being tased, Plaintiff immediately yelled out and crouched down, facing away from the officers, and lowered himself prone to the ground with his hands on the ground and his elbows sticking up at his sides. (*Id.* at 12:19:27.)[8] The other,

_____

[8] Plaintiff disputes that, while he was standing with his hands raised and Officer Robinson ordered him to get down on the ground, he put his hands down and started walking away; he claims, instead, that he "was in the process of getting to the ground" at the time. (Doc. 153 ¶ 68; Pl. Decl. ¶ 14.) Inferring in Plaintiff's favor that he intended to get on the ground when he dropped his hands, Plaintiff's subjective intent is insufficient to create a genuine issue of fact regarding what Officer Robinson saw. The video clearly shows Officer Robinson repeatedly yell for Plaintiff to get on the ground and Plaintiff talk back, then turn sideways, drop his hands, and step forward while, at the same time, turning to face the officers and moving his hands up and down close to his sides. (Robison bodycam at 12:19:26−27.) Plaintiff's assertion that he was tased in the front of his chest, not his side or back (Doc. 153 ¶ 69), also does not materially conflict with the video evidence in which the right side and front of Plaintiff's upper body and face are intermittently visible from Officer Robinson's bodycam overt his time and just before Plaintiff is tased. (*See* Robinson bodycam at 12:19:26−27.)

unidentified officer stepped forward while also pointing a yellow taser at Plaintiff, and commanded Plaintiff to put his hands out, and Plaintiff then spread his arms out flat on the ground, perpendicular to his body.  (*Id.* at 12:19:28.)

Officer Gaughan arrived when Plaintiff was face-down on the ground, being detained at taser point by Officer Robinson and the other, unidentified officer.  (Doc. 144 ¶ 72.)  Officer Gaughan and two other officers placed Plaintiff in handcuffs, searched his pockets and clothing, and turned him onto his side and removed two taser darts, one from his stomach, and one from his chest.  (*Id.* ¶ 73; Robinson bodycam at 12:22-20−38; Doc. 153 ¶ 69.)  While being searched, Plaintiff did not specifically state he was injured, but he told Officer Gaughan he "hurt," and Officer Gaughan saw that he "was bleeding," but Officer Gaugan told Plaintiff he had just run over 200 yards and did not need medical care.  (Doc. 153 ¶ 74; Doc. 154-2 (Pl. Aff.) ¶ 16.)  Based on Plaintiff's affidavit and available bodycam video, one of the officers asked if Plaintiff had any injuries other than a cut on his hand, Plaintiff's response is inaudible, then an officer asked, "is that from crashing?" and Plaintiff answered in the affirmative.  (Pl. Aff. ¶ 16; Doc. 144, Exs. 15, 16 (unidentified officer bodycams) at 12:23:20−24.)  Plaintiff also alleged in the Second Amended Complaint that his lip was visibly contused and bleeding.  (Doc. 111 at 10.)

After collecting and bagging various items from the arrest scene, the officers helped Plaintiff to his feet, and Plaintiff walked under his own power to one of the officer's patrol cars while conversing calmly with the officers and repeatedly complaining that "you guys crashed into me."  (Doc. 144, Ex. 17 (unidentified officer bodycam) at 12:29:26−38.)  Over the next several minutes, while he was seated in the back of the patrol car, Plaintiff continued to converse with the officers, an officer told him he was under arrest and read him his rights, and Plaintiff conveyed a message to that officer to give to his employer "Justin" to let him know where his work keys were.  (*Id.* at 12:29:38−12:33:34.)  During this time, and over the next several minutes while seated in the back of the patrol car, Plaintiff talked calmly with the officer who had just read him rights and taken down the message for Justin, conversing generally about what happened that night and about other

things going on in his life, and he did not complain of or show any sign of physical impairment or distress and did not request medical attention.  (*Id.* at 12:29:38−12:38:34.)

### B.     Count One: Fourth Amendment Claims

#### 1.     Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary.  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968).  This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by

the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law."  *Scott*, 550 U.S. at 381 n.8.  But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force.  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

### 2.   Discussion

Plaintiff asserts Fourth Amendment excessive-use-of-force claims against Defendants Gaughan and Krajcer based on their alleged use of excessive, deadly force against him when they crashed their vehicles into the Trailblazer at the Red Roof Inn and against Defendant Rowan based on his alleged failure to intervene in Defendant Krajcer's excessive use of force.  (Doc. 111 at 7.)  Plaintiff also brings an excessive-use-of-force claim against Defendant Robinson based on Robinson's tasing of Plaintiff and a failure to provide medical assistance claim against Defendant Gaughan for his alleged refusal, as a supervising officer, to provide Plaintiff requested medical attention after these alleged excessive uses of force.  (*Id.* at 8−9.)

#### a.   Vehicle Collisions

As noted, to determine whether a Fourth Amendment violation occurred, the Court must first assess the nature of the force inflicted.  Defendants argue that the nature of the force used during the collisions at the Red Roof Inn was not severe.  (Doc. 149 at 7.)  This is because, they argue, Officer Gaughan was at a standstill or barely moving forward in the Tahoe at the time of impact, and although Officer Krajcer's rate of speed in the Silverado is unknown, Plaintiff estimated he was driving only 5−7 mph at the time of the collisions.

(*Id.*)  Defendants further point out that Plaintiff was able to speed away in the Trailblazer after the collisions; he only complained of a sore neck afterwards; the officers were also not seriously injured; and, after he then crashed into a tractor, Plaintiff was able to run on foot, eluding police.  (*Id.* ns. 4, 5.)  From this, Defendants conclude that the amount of force was not sufficient to stop Plaintiff and did not equate to deadly force.  (*Id.*)

Deadly force is that which "creates a substantial risk of causing death or serious bodily injury."  *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005).  In *Scott*, in which a police officer rammed his patrol car into the back of a fleeing vehicle, causing it to run off the road and flip over, the Supreme Court recognized that crashing into a fleeing vehicle was sufficient to pose "a high likelihood of serious injury or death."  550 U.S. at 384.  But the Court noted that this use of force did not pose "the near certainty of death" posed by shooting a fleeing suspect and did not require the same imminent threat of deadly harm from the suspect to justify its use.  *Id.* ("[a] police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun.") (internal quotation marks and citation omitted).  Additionally, although it is the amount of force, not the amount of injury, that matters in the use-of-force analysis, courts may consider "the severity of injuries in evaluating the amount of force used" and "may infer from the minor nature of a plaintiff's injuries that the force applied was minimal."  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).  "While injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when that force is of the type likely to cause injuries."  *Id.*

Contrary to Plaintiff's allegations, Officers Gaughan and Krajcer's use of their patrol vehicles to attempt to stop Plaintiff in the Trailblazer did not amount to deadly force.  The evidence shows that, when Officer Gaughan tried to stop the Trailblazer at the front of the Red Roof Inn, he initially only stopped his patrol car in front of the Trailblazer to block it in.  Then, when Plaintiff backed up and turned the Trailblazer to start driving southbound, along the east side of the motel, Officer Gaughan resumed driving, but he could not have been moving very fast when his vehicle struck the side of the Trailblazer because he had

only just restarted the vehicle.  (Gaughan bodycam at 12:13:45−52.)  Although the video evidence shows that the side of the Trailblazer was dented in, which the Court infers in Plaintiff's favor happened as a result of the crash, the lack of serious injury to Officer Gaughan or Plaintiff or any damage beyond minor scuff marks to the front push bars of Officer Gaughan's patrol car indicate that this use of force was moderate.

The head-on collision with Officer Krajcer's unmarked Silverado constituted a much higher degree of force.  Contrary to Defendants' arguments, Plaintiff estimated he was driving up to 10 mph, not 5 to 7 mph, when he collided with the Silverado, but in any case, the operative question is the extent of force used by Defendant Officers.  Absent any facts showing how fast Officer Krajcer was driving, the Court infers from Officer Krajcer's rapid movements and the squealing tires when he turned and began driving northbound towards the Trailblazer's location that Officer Krajcer was travelling at a moderate to high rate of speed by the time he collided with the Trailblazer.  Officer Krajcer also suffered more than minor injuries, including a concussion; the Tahoe airbags deployed; and the Tahoe was "out of commission," with its hood visibly crumpled in.  Construing all the facts in Plaintiff's favor, this collision constituted at least moderate to high non-deadly force.

Whether moderate and moderate to high non-deadly uses of force were reasonable under the circumstances depends on the government interests at stake at the time of these respective crashes, which requires analyzing the severity of Plaintiff's suspected crimes, the threat posed by Plaintiff at the time, and whether Plaintiff was resisting arrest. *Graham*, 490 U.S. at 396−97.

As to the severity of his suspected crimes at the time, it is undisputed that Plaintiff was driving a vehicle that had recently been stolen in a strong-armed robbery.  A motorist had also complained an hour earlier that Plaintiff had run a red light and stop sign and almost hit her vehicle.  After that, Plaintiff failed to pull over for a marked patrol car with its lights and sirens activated and had eluded multiple police cars in a high-speed pursuit, going up to 80 mph.  Then, just before the collisions at the Red Roof Inn, Plaintiff again failed to stop when Officer Gaughan tried to pull him over in a marked patrol car with

lights and sirens.  To Officers Gaughan's and Krajcer's knowledge, then, Plaintiff was suspected of a violent crime involving the theft of a vehicle, driving recklessly, and endangering others and evading arrest while fleeing from police at excessive rates of speed.  These suspected crimes support a high government interest at stake in apprehending Plaintiff; "[t]he government has an undeniable legitimate interest in apprehending criminal suspects."  *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) (internal citation omitted).

Plaintiff argues that the TPD officers had no evidence at the time that he was the suspect who had stolen the Trailblazer, and he denies knowing that the vehicle was stolen until after his arrest.  (Doc. 152 at 11; Doc. 153 ¶ 4.)  This argument is unavailing because the reasonableness of the officers' actions must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Here, it was objectively reasonable for Officers Gaughan and Krajcer to believe that the driver of the stolen Trailblazer—who had repeatedly fled from marked police vehicles trying to stop him—had been involved in the prior strong-armed robbery of that vehicle.  Additionally, running stop lights, almost hitting another vehicle, and failing to stop for a police car with lights and sirens were, in themselves, serious and dangerous offenses that also point to a high government interest at stake in stopping Plaintiff.

The other factors bearing on the government interest at stake—the threat posed by Plaintiff and whether Plaintiff was resisting arrest—are in accord.  A reasonable officer in Officers Gaughan's and Krajcer's positions could have reasonably believed that the driver of a stolen vehicle, who had reportedly run a red light and stop sign, nearly hitting another vehicle on Baseline Road; had failed to pull over for a marked patrol with lights and sirens; had continued to evade police on a high-speed chase; and was still refusing to pull over for Officer Gaughan, posed a threat of serious harm to the community.  The same undisputed evidence shows that Plaintiff was actively and persistently resisting arrest.  These additional *Graham* factors therefore also support a high government interest at stake in stopping Plaintiff.

The remaining question is whether Defendant Officers' uses of force were greater than reasonable under the circumstances. *Espinosa*, 598 F.3d at 537.

Defendants have met their initial burden of showing that Officer Gaughan and Krajcer's moderate to high uses of force were reasonable because Plaintiff had shown he was determined to flee from police, and if these officers had not used significant force to stop him, he would have continued to flee, putting the public at risk and keeping law enforcement from apprehending someone suspected of a violent crime. (Doc. 143 at 8.)

Plaintiff fails to create a genuine issue of material fact that, under the circumstances confronting these officers at the time, any lesser degree of force would have stopped him from fleeing and continuing to endanger the public and would have kept him from escaping arrest for a suspected strong-armed robbery and other dangerous, criminal behavior. Plaintiff argues that these officers' use of their vehicles to stop the Trailblazer was not authorized by TPD policy, citing to a policy allegedly requiring emergency situations and supervisor approval before initiating a roadblock. (Doc. 152 at 12.) Even if the cited policy applies to this situation, this argument misses the mark. The question for Fourth Amendment purposes is not whether the defendant officers fully complied with all department policies, but whether their uses of force when blocking, then colliding with Plaintiff's vehicle were objectively reasonable under the circumstances.

In *Scott*, the Supreme Court found that an officer's use of potentially deadly force by crashing into the back of a suspect's speeding vehicle was justified to protect the public where the suspect driver had "intentionally placed himself and the public in danger." 550 U.S. at 384. The Court opined that police officers should not be required to call off a pursuit due to a suspect's reckless driving rather than engage in potentially deadly force to stop the suspect because doing so would not eliminate the potential threat of serious harm to the public and would perversely incentivize suspects to recklessly flee. *Id.* at 384−85.

Here, as in *Scott*, it is undisputed that Plaintiff had already fled and endangered the public in an earlier pursuit. Under these circumstances, it was objectively reasonable for Officers Gaughan and Krajcer to believe that he would do so again when he failed to stop

for Officer Gaughan at the Red Roof Inn.  Plaintiff was not then driving at a high rate of speed, and he claims he was not posing an imminent danger to anyone at the time. (Doc. 152 at 9.)  But Officers Gaughan and Krajcer's uses of force to attempt to stop him were also less severe than the potentially deadly force in *Scott* that caused the suspect's vehicle to run off the side of the road at a high rate of speed.

Initially, Officer Gaughan merely attempted to block the Trailblazer in by stopping his patrol car in front of it while preparing to get out and make an arrest.  Then, when Plaintiff backed up, turned the Trailblazer around, and began to drive head-on toward Officer Krajcer's vehicle, Officer Gaughan crashed into the side of Trailblazer with only moderate force.  Officer Krajcer's head-on collision with Plaintiff, while notably more severe, was not deadly force or even significantly injurious to Plaintiff.  Construing the facts in Plaintiff's favor, these uses of force were at least moderate to high, but the government interest at stake in apprehending Plaintiff was also high.  Such uses of force were therefore reasonably balanced against the need for force and were not "greater than [wa]s reasonable under the circumstances."  *Espinosa*, 598 F.3d at 537.

Because there is no triable issue of fact that Officers Gaughan and Krajcer used excessive force when they crashed into the Trailblazer to stop Plaintiff, the Court need not discuss Plaintiff's claim against Officer Rowan based solely on his alleged failure to intervene.  Plaintiff's excessive-use-of-force claims based on the vehicle collisions in Count One fail as a matter of law, and the Court will dismiss these claims with prejudice.

### b.    Taser Shot

When used in dart-mode, tasers emit a pair of barbs connected to insulated wires, which deliver an electrical charge into the muscles that "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless."  *Bryan v. MacPherson*, 608 F.3d 614, 620 (9th Cir.), *opinion withdrawn and superseded on denial of reh'g,* 630 F.3d 805 (9th Cir. 2010).  "The tasered person also experiences an excruciating pain that radiates throughout the body."  *Id.*  The Ninth Circuit has held that the use of a taser in dart mode "constitute[s] an intermediate, significant level

of force." *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (quoting *Bryan*, 608 F.3d at 620) (internal quotation marks omitted).

As to the need for force when Plaintiff was tased, the Court has already determined that there was a high government interest at stake in arresting Plaintiff when Officers Gaughan and Krajcer crashed into the Trailblazer at the Red Roof Inn. Prior to this, Officer Robinson had searched for the Trailblazer following the high-speed pursuit, and he later learned from radio traffic that the Trailblazer had rammed a squad car at the Red Roof Inn in a reported aggravated assault on an officer, had subsequently crashed through a fence and into a tree and a tractor, and had abandoned the Trailblazer and continued to flee from TPD officers on foot. (Doc. 144 ¶ 60; Robinson Decl. ¶¶ 3−8.) When he drove into the business park to look for Plaintiff, Officer Robinson was therefore aware of the seriousness of Plaintiff's suspected crimes, the threat Plaintiff posed to himself and others, and his continuing flight from law enforcement. Based on these factors, Officer Robinson, like Officers Guaghan and Krajcer, could have reasonably concluded there was a high government interest at stake in apprehending Plaintiff.

In addition to these facts, the video from Officer Robinson's bodycam during his foot pursuit of Plaintiff shows that Plaintiff continued to run, disregarded Officer Robison's repeated commands for him to stop and show his hands, and ignored repeated warnings that if he did not stop, he would get tased. (Robinson bodycam at 12:18:52−12:19:13.) When he did eventually stop, Plaintiff also refused repeated commands to turn around and get on the ground and, instead, dropped his hands to his sides and started moving again, causing Officer Robinson and the unidentified officer who had just arrived to warn him yet again that he would get tased if he did not comply with Officer Robinson's commands.

Based on these facts, and under the totality of the circumstances confronting the officers at the time, it was objectively reasonable for Officer Robinson to fire his taser one time at Plaintiff to gain his compliance, permitting the officers to handcuff him. *Lindsay v. Kiernan*, 378 F. App'x 606, 609 (9th Cir. 2010) (use of taser on an actively resistant, uncooperative suspect was reasonable where the suspect "ignored [the officer's] warning

that [the officer] would deploy the taser unless [the suspect] complied with the officers' orders); *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1355 (11th Cir. 2015) ("striking, kicking, and tasing the resisting and presumably dangerous suspect in order to arrest him were not unreasonable uses of force").  It is also undisputed that, after this single taser use subdued Plaintiff enough to finally allow the officers to arrest him, Officer Robinson did not use any additional force.

In summary, this intermediate, significant level of force was reasonably balanced against the high government interest at stake in arresting Plaintiff when he ran from police and was not "greater than [wa]s reasonable under the circumstances."  *Espinosa*, 598 F.3d at 537.  Accordingly, the Court will grant summary judgment to Defendants on Plaintiff's excessive-use-of-force claim based on Officer Robinson's use of a taser.

### c.      Failure to Provide Medical Care

Like uses of force at the time of an arrest, an officer's failure to provide medical care to an arrestee is analyzed under the Fourth Amendment objective reasonableness test. *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006) (citing *Graham*, 490 U. S. at 395.)  To prevail on a claim under this standard, a plaintiff must show that an arresting officer failed to respond to a medical need posing a substantial risk of serious harm, even though "a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th Cir.) (applying objective reasonableness test to a pre-trial detainee's Fourteenth Amendment medical care claim) (internal quotation marks and citation deleted).  Just as the Fourth Amendment does not require officers to use the least amount of force when making an arrest, it does not require an officer "to provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Id.*  Instead, "a police officer who promptly summons the necessary medical assistance following an arrest has acted reasonably for purposes of the Fourth Amendment." *Id.* at 1099; *Borges v. City of Eureka*, No. 15-CV-00846-YGR, 2017 WL 363212, at *7 (N.D. Cal. Jan. 25, 2017).  ("Although taking Borges to the hospital may

have been the most effective medical care for him in hindsight, this is not required by the Fourth Amendment").

Defendants argue that Plaintiff's failure-to-render-aid claim against Officer Gaughan fails as a matter of law because, at the time of arrest, Plaintiff did not have any objectively serious injuries requiring emergency medical aid or transportation to the hospital. (Doc. 143 at 13−14.)  They point out that, although Plaintiff claims he told Officer Gaughan his knee hurt and his lip was bleeding, and he requested medical attention, the video evidence shows that, after being placed in a squad car, Plaintiff calmly and coherently conversed with one of the officers and was not in any apparent medical distress. (*Id.* at 14.)

Although not audible on bodycam video, the Court takes as true Plaintiff's testimony that he told Officer Gaughan he "hurt," and Officer Gaughan responded that he had just run more than 200 yards and did not need medical care.  (Pl. Aff. ¶ 16.)  But these facts do not give rise to a constitutional claim.  Plaintiff admits that he did not tell Officer Gaughan about any specific injuries, and there is no evidence Plaintiff had any objectively serious injuries that would have alerted a reasonable officer in Officer Gaughan's position that he required immediate medical attention.  A reasonable jury could infer from Plaintiff's allegations and the comments and questions of the arresting officers that Plaintiff's lip and/or hand were bleeding from the earlier collisions.  But Plaintiff does not claim that these injuries were more than de minimus or that he had any other apparent injuries from which a reasonable officer could have inferred he required immediate medical aid before being taken into custody.

As Defendants point out, Plaintiff's actions after his arrest further belie any such claims.  Bodycam video shows Plaintiff sitting in the back of the patrol conversing calmly about a variety of topics with one of the officers, even requesting that the officer contact his employer and providing him contact information to do so, but he makes no request of this officer for medical care; never mentions he is hurting, bleeding, or otherwise injured; and does not appear to be in any discernable physical distress.  Absent any evidence that

Plaintiff had an objectively serious medical need that required immediate attention, a reasonable jury could not find that Officer Gaughan acted unreasonably when he determined Plaintiff did not need medical care. *See Borges*, 2017 WL 363212, at *7 ("[P]laintiff has offered no authority to suggest that the only reasonable course of action is to take the arrestee to the hospital rather than a nearby jail, where the arrestee should receive a medical evaluation"). Plaintiff's claim against Officer Gaughan for failure to provide medical care therefore fails as a matter of law, and the Court will grant summary judgment to Defendants on this claim.[9]

## IV. Count Two: Violation of Personal Privacy

### A. Facts

On February 1, 2018, ABC News 15, Arizona ("ABC15"), published a report about Plaintiff's arrest, which identified Plaintiff by name and ended by stating, "Outley, who is a convicted child sex offender from California, has been charged with theft, criminal damage and multiple counts of aggravated assault." (Doc. 153 ¶ 87; Doc. 154-8 at 33−35.) Earlier, the article states, "Tempe Police report . . . ," indicating that some or all of the information in the article is based on information from TPD. (Doc. 154-8 at 33.)

Information publicly available online via the Tulare County Superior Court in California shows that, on February 3, 2006, Plaintiff pleaded no contest to the following: "Felony-Sex offender/Failure to update information PC290(a)(1)(D)." (Doc 144-21, *available at* https://efiling.tulare.courts.ca. gov/?q=node/364/ 534543/FV-Filings-Portal (last visited March 21, 2022).) Plaintiff admitted in his deposition to being required to register as a sex offender. (Doc. 144 ¶ 90.)

Officer Trow was not a public information officer for TPD at the time of Plaintiff's arrest on January 25, 2018 and did not issue a press release or any other public or media

---

[9] Because the Court will grant summary judgment to Defendants on all Plaintiff's Fourth Amendment claims, the Court need not address Defendants' argument that Defendant Officers are entitled to qualified immunity on these claims.

1   statement about that arrest or any prior offenses, arrests, adjudications, or convictions of

2   Plaintiff.  (*Id.* ¶¶ 87−88.)

3   **B.   Legal Standard**

4   The Supreme Court has broadly recognized a constitutional right of individuals to

5   "avoid[] disclosure of personal matters."  *Whalen v. Roe*, 429 U.S. 589, 599 (1977) (citing

6   *Nixon v. Adm' of Gen. Servs.*, 433 U.S. 425, 457 (1977) ("public officials . . . are not wholly

7   without constitutionally protected privacy rights in matters of personal life unrelated to any

8   acts done by them in their public capacity")).  Further, at least one Ninth Circuit case has

9   impliedly recognized a constitutional right to privacy in a plaintiff's confidential juvenile

10   court records.  *Gonzalez v. Spencer*, 336 F.3d 832, 835 (9th Cir. 2003) (per curium),

11   *abrogated on qualified immunity grounds by Filarsky v. Delia*, 566 U.S. 377, 383 (2012)

12   ("Because Spencer improperly obtained access to Gonzalez's juvenile court file, we need

13   not reach the question whether Spencer's use of Gonzalez's file in depositions also violated

14   his constitutional rights").  But there is no firmly established constitutional right to

15   informational privacy regarding one's juvenile court records.  *See, e.g.*, *A.C. v. Cortez*, 398

16   F. Supp. 3d 748, 752 (S.D. Cal. 2019), *aff'd*, No. 19-55895, 2021 WL 4705511 (9th Cir.

17   Oct. 8, 2021) (discussing Ninth Circuit and district court cases and finding "no legal

18   cognizable theory" for the plaintiffs' constitutional invasion of privacy claims against

19   county attorneys based on their accessing the plaintiffs' juvenile court files); *Cf. Huling v.

20   City of Los Banos*, 869 F. Supp. 2d 1139, 1155 (E.D. Cal. 2012) (dismissing constitutional

21   claim based on police officer's disclosure of the plaintiff's hospital confinement to

22   Plaintiff's employer because there was then no firmly established federal or constitutional

23   right to informational privacy, including privacy of one's personal medical information).

24   **C.   Discussion**

25   Defendants argue that Plaintiff's constitutional privacy claims against Officer Trow

26   and Chief Moir fail on the merits because Officer Trow was not a TPD public information

27   officer; there is no evidence Officer Trow or Chief Moir disclosed Plaintiff's juvenile

28   criminal records; there is no evidence Chief Moir provided training to Officer Trow

regarding issuing press releases; and there is no evidence ABC15 obtained any information about Plaintiff's juvenile records through a press release or statement by Officer Trow or Chief Moir. (Doc. 143 at 15−16.)  Defendants also argue that these Defendants are entitled to qualified immunity on any such claims because there is no clearly established constitutional right to privacy in juvenile records, and they argue that Plaintiff cannot claim his juvenile records were private.  (*Id.* at 16.)  As to this last argument, Defendants wrongly rely on the publicly available information regarding Plaintiff's failure to register as a sex offender as proof that Plaintiff's underlying child sex offense was also public information.

Defendants have put forth sufficient evidence to show that Officer Trow was not a TPD public information officer and did not disclose any information to ABC15 regarding Plaintiff's juvenile records.  To the extent Plaintiff also seeks to bring a claim against Chief Moir for disclosure of this information or failure to train, there is also no evidence that Chief Moir disclosed Plaintiff's juvenile records to ABC15, was involved in training TPD public information officers regarding disclosure of such records, or that any alleged failure to train, even if attributable to Chief Moir, led to the disclosure of Plaintiff's juvenile records to ABC15 in this case.  Additionally, as noted above, there is no clearly established federal or constitutional right to non-disclosure of juvenile court records.  For these reasons Defendants have made an initial showing that they are entitled to summary judgment on Plaintiff's constitutional privacy claims.

Plaintiff fails to create a triable issue of fact as to this showing.  Plaintiff claims, without evidence, that the ABC15 article regarding Plaintiff's juvenile sex offense "quoted exactly what Defendant Trow wrote."  (Doc. 152 at 18.)  Absent any evidence showing "what Defendant Trow wrote" to support this claim, however, Plaintiff fails to create a genuine issue of material fact that Officer Trow wrote about Plaintiff's juvenile records in any way or, even if he did, that he provided this information to ABC15.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Scott*, 550 U.S. at 380 (quoting *Anderson*, 477 U.S. at

247−48) (internal quotation marks omitted) (emphases in *Anderson*); Fed. Rule Civ. P. 56(c); *see also Matsushita Elec.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

Plaintiff also argues that public disclosure of a suspect's juvenile offenses goes against TPD policy.  (Doc. 152 at 18.)  But even if Plaintiff could show that Officer Trow, Chief Moir, or anyone else at TPD failed to follow department policy regarding the disclosure of Plaintiff's juvenile records, violation of department policy does not on its own give rise to a constitutional claim.  *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (violations of state departmental regulations or policies does not establish a federal constitutional violation).  Plaintiff has also not identified any Supreme Court or Ninth Circuit cases that firmly establish a constitutional or other federal right to privacy in one's juvenile court records.  For this reason, even if Plaintiff could succeed on the merits of his constitutional privacy claims, Officer Trow and Chief Moir would be entitled to qualified immunity on these claims.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotation marks and citation omitted).

For the above reasons, Plaintiff's constitutional privacy claims in Count Two fail as a matter of law, and the Court will grant summary judgement to Defendants on these claims.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 143).

. . . .

. . . .

(2)     Defendants' Motion for Summary Judgment (Doc. 143) is **granted**, and the action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 24th day of March, 2022.

James A. Teilborg
Senior United States District Judge